Filed 4/4/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B270426 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA136977) |
| v. | |
| MARK MALIK SCOTT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, John T. Doyle, Judge. Affirmed in part and reversed in part.

———

Kevin D. Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Colleen M. Tiedemann and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

———

Appellant Mark Malik Scott appeals from the judgment entered on his two convictions of second degree attempted robbery and four convictions of second degree robbery. Appellant asserts that the court violated his constitutional right to a public trial when the court excluded his family members from the courtroom during a portion of the trial and that such violation requires reversal of all the convictions. Although we agree that the court erred in granting the exclusion order, we reject the request to reverse all the convictions. Rather, we tailor the remedy to fit the violations and accordingly reverse the judgment only on those counts where the victims testified while appellant's family was excluded from the courtroom.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 7, 2015, near 109th Street and San Pedro Street in Los Angeles, appellant approached two juveniles, A.S. and J.G., as they were walking to their high school. After asking them for the time, appellant lifted his shirt to reveal the handle of a black gun in the waistband of his pants. He demanded that A.S. and J.G. hand over their cellular phones, and they complied. The next day, appellant approached 12-year-old J.V., who was riding her bicycle. Appellant asked her the time, showed that he had a gun, and demanded J.V.'s bicycle and cellular phone, which she gave him.

At about 7:25 a.m. on April 9, 2015, appellant approached teenage middle schoolers L.T. and E.J., reached into his clothing as though he had a gun, and demanded their cellular phones.[1]

---

[1] About a week before, appellant, whom E.J. recognized, asked E.J. where she was from. She answered, "I'm not from anywhere." He responded, "This is East Coast Crips. See yourself

E.J. handed over her phone, but L.T. refused to do so.  Appellant pursued L.T. into a convenience store.   When the store clerk intervened, appellant returned E.J.'s phone to her and fled.  About 10 minutes later, appellant approached a woman, K.M., who was waiting at a bus stop and attempted to rob her of her cellular phone.

An information charged appellant with six counts—one count for each victim.  In counts 1 and 2 the information charged appellant with second degree robbery arising from the incident involving A.S. and J.G.  Count 3 alleged second degree robbery based on the incident with J.V.  Count 4 alleged the attempted robbery of K.M.  Counts 5 and 6 alleged second degree robbery of E.J. and attempted second degree robbery of L.T., respectively.  The information further alleged gang and weapons enhancements.

At the outset of the trial, the court admonished everyone in the courtroom, including members of appellant's family who were present, not to have any contact with the prospective jurors.  The next morning, at a break during jury selection, prospective juror No. 2 advised the trial court that while she was riding in the elevator at the courthouse with appellant and his father, after the first day of jury selection, appellant's father made a comment to her.  Appellant's father observed that the juror worked as a nurse and he asked whether she had been excused.  After prospective juror No. 2 said that she had not been excused, the conversation ended.  The court excused her from the panel after the prospective juror indicated that the interaction could affect her ability to perform her duty as a juror.  The prosecutor characterized

---

walking out [of] the hood."  When police arrested appellant, he wore sandals that had "ECC" and "East Coast Crip" written on them.

appellant's father's contact with prospective juror No. 2 as an attempt at "manipulation by the family" in direct violation of the court's order not to have any contact with the jurors. The prosecutor further argued that appellant's father should be found in contempt or excluded from the proceedings. Appellant's counsel asked the court to wait until the completion of the trial before deciding whether to initiate contempt proceedings against appellant's father and acknowledged the court's right to exclude appellant's father from the courtroom proceedings if the court believed he would engage in further disruptive conduct. The court advised appellant's father that the alleged incident was serious and that contempt proceedings were pending against him.

Later in the trial, on the morning of January 15, 2016, the court excluded appellant's family members from the proceedings during the testimony of several witnesses including three of the minor victims based on the prosecutor's claim that the victims did not want to testify because they had been threatened and felt intimidated. The jury found appellant guilty on all six counts and found the weapons allegations true.[2] The trial court sentenced appellant to an aggregate determinate term of 20 years 8 months in state prison. Appellant filed a timely notice of appeal.

---

[2] The jury deadlocked, and the court declared a mistrial, on the gang allegations.

4

# DISCUSSION

Appellant claims that the trial court violated his constitutional right to a public trial when it excluded his family members from attending the trial during the entirety of the morning session on January 15.  For reasons discussed below, we agree.

## A.    Factual Background

On the first day of trial, no one was excluded from the courtroom.  A.S. (the victim in count 1) and J.G. (the victim in count 2) testified that appellant had robbed them of their cellular phones.  K.M. (the victim in count 4) testified that appellant attempted to rob her of her cellular phone.

The next morning, outside the presence of the jury, E.J.'s mother addressed the court, stating that although E.J. wanted to "make a statement," she did not want to take the stand to testify. The court acknowledged E.J.'s concerns, but also stated that because E.J. had been subpoenaed as a witness, she would have to testify, and that appellant's counsel had the right to question her about the incident.

Several minutes later, also outside of the presence of the jury, the prosecutor reported to the trial court that she had been informed by a police detective that L.T.'s mother had received threats over the telephone "that if [L.T.] testifies in this case, that that will cause problems."  These threats reportedly put L.T. and her family in "fear for their safety" and made them "very concerned about retaliation."  The prosecutor reported that the family did not know the identity of the caller, and informed the court that the matter was under investigation.  The prosecutor asked that the court exclude appellant's family from the courtroom during the

testimony of E.J. and L.T., because: "They are very scared. They do not want to participate in this case. They are doing so under subpoena. And I think given their age and the threats and the type of case this is, that it's a gang case, I think it is totally appropriate within the court's discretion to remove those individuals during their testimony."

Appellant's counsel objected, arguing that excluding the family members violated appellant's right to a public trial, pointing out that the threats were unsubstantiated and that there was no evidence that the family members were the source of the threats. The court, however, agreed with the prosecutor, observing that "[t]he specter of intimidation with witnesses has been looming over this trial for some time now . . . . I'm getting mounting evidence that the witnesses are in fear and that they've been intimidated. While there's no direct evidence that this can impeach any family members, we had another incident that [a] family member had contact with a juror against a court order, and we had to . . . get rid of that juror. So I will do that. I will exclude family members for purposes of the testimony of these two next victim witnesses." The court then asked the appellant's two family members present to leave the courtroom, and cautioned everyone that remained: "The issue of fear can be adduced on the record in front of the jury as to how it affects the witness's testimony. But we have no clear implication that other than just being generally afraid of courtroom processes that something specific has been communicated to these witnesses at the request of or in acquiescence by the [appellant] or his family. So to that extent, I don't want to hear anything in front of the jury to the effect, well, now that the [appellant's] family is excluded, don't you feel better and are you telling the truth." The court added that if witnesses

testified about threats, the court would admonish the jury that there was no specific evidence that appellant or his family had made the threats.

The prosecutor then informed the court that she had just been told by a detective that L.T.'s mother did in fact know the identity of the person who called her and made the threat, but that she was afraid to provide the name out of fear of retaliation. The court declined to inquire further into the matter.

When the proceedings resumed, E.J., L.T., L.T.'s aunt, J.V., and J.V.'s father testified.[3] None of these witnesses testified to facts concerning the crimes alleged against A.S., J.G., or K.M. Thereafter, the court excused the jury for the noon recess and asked the prosecutor, "Are we out of the woods of fear?" The prosecutor responded, "We're done with the civilians." The court then stated that it "will lift the order excluding the [appellant's] family from the proceedings this afternoon. They can come in." No one was thereafter excluded from the courtroom.

When the trial resumed in the afternoon, Officer Windle Hawkins testified about an interview she conducted with L.T., and Detective Michael Fairchild testified regarding his investigation of the crimes, including his interviews with E.J. and L.T. On the third day of trial, Detective Fairchild continued his testimony, and Officer Hector Beas testified as a gang expert.

---

[3] L.T.'s aunt testified that L.T.'s family had received a couple of threatening phone calls, which made them fear for their safety. The court thereafter admonished the jury that there was no evidence that appellant or his family had made any threats.

J.V.'s father identified a bicycle that police had taken from appellant as a bicycle he had built for J.V.

## B. Analysis

The United States Constitution and the California Constitution guarantee a criminal defendant the right to a public trial, including the right to have friends and relatives present during the proceedings. (See U.S. Const., 6th & 14th amends.; Cal. Const., art. I, § 15; *Presley v. Georgia* (2010) 558 U.S. 209, 210, 214-215; *In re Oliver* (1948) 333 U.S. 257, 271-272, fn. 29 [noting special concern for assuring attendance of a defendant's family members and friends].) The right to a public trial serves two important interests. It protects those who are accused of a crime by helping to ensure that the innocent are not unjustly convicted and that the guilty are given a fair trial. (*Id*. at p. 270, fn. 25.) Second, there is a "strong societal interest in public trials"; they provide an opportunity for spectators to observe the judicial system, improve the quality of testimony, encourage witnesses to come forward with relevant testimony, and prompt judges, lawyers, witnesses, and jurors to perform their duties conscientiously. (*Gannett Co. v. DePasquale* (1979) 443 U.S. 368, 383.)

"Given the importance of public trials to both the accused and the public, there is a ' "presumption of openness" ' in the courtroom that ' "may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." ' " (*People v. Baldwin* (2006) 142 Cal.App.4th 1416, 1421, quoting *Waller v. Georgia* (1984) 467 U.S. 39, 45 (*Waller*) [holding that instances when closure of the courtroom is appropriate "will be rare . . . and the balance of interests must be struck with special care"].)

The Supreme Court in *Waller* identified four requirements necessary to justify exclusion: (1) the existence of an overriding interest that is likely to be prejudiced absent the closure;

8

(2) the closure is narrowly tailored, i.e., no broader than necessary to protect that interest; (3) no reasonable alternatives to closing the proceeding are available; and (4) the trial court must "make findings adequate to support the closure." (*Waller*, *supra*, 467 U.S. at p. 48; accord, *People v. Woodward* (1992) 4 Cal.4th 376, 383.) The court cannot determine the application of the above principles in the abstract; they must be determined by reference to the facts of the particular case. (*People v. Pena* (2012) 207 Cal.App.4th 944, 949.) Having those considerations in mind, we are persuaded that the *Waller* test was not satisfied in this case.

With respect to the first requirement, the protection of witnesses from threats, harassment, or physical harm is an overriding interest and deserving of protection. (See *NBC Subsidiary (KNBC–TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1223, fn. 48 [the protection of witnesses from intimidation is one of the "overriding interest[s]" that may justify closure of a courtroom]; *United States v. Hernandez* (9th Cir. 1979) 608 F.2d 741, 747.) In a different context, our Supreme Court has emphasized the "serious nature and magnitude of the problem of witness intimidation. . . . The state's ability to afford protection to witnesses whose testimony is crucial to the conduct of criminal proceedings is an absolutely essential element of the criminal justice system." (*Alvarado v. Superior Court* (2000) 23 Cal.4th 1121, 1149-1150, fn. omitted.)

Although we consider appellant's claim that he was deprived of his constitutional right to a public trial de novo (see *U.S. v. Shryock* (9th Cir. 2003) 342 F.3d 948, 974), the court's finding that witnesses had been threatened and that appellant's family members were involved in some way with those threats are factual determinations, which we review for substantial evidence (cf. *People*

9

*v. Cromer* (2001) 24 Cal.4th 889, 893-894; *People v. Edwards* (1991) 54 Cal.3d 787, 807.) Here, the record does not support the court's findings because there is no substantial evidence that any member of appellant's family was in any way involved with the purported threats. The court based its decision to exclude appellant's family on only a suspicion that appellant's family might have something to do with the intimidation. The prosecutor stated that the phone threats were under investigation and had not been linked to appellant or any other person. The only evidence connecting any of appellant's family members with any potentially improper conduct was appellant's father's contact with a juror earlier in the proceedings. Though improper, the nature of that contact was not intimidating or threatening and was therefore insufficient to support the conclusion that family members threatened anyone.

Moreover, even after the prosecutor disclosed to the court that L.T.'s mother knew the identity of the caller who issued the threat, the court did not take that opportunity to probe any connection to appellant or his family to the alleged threats. "The exclusion of any nondisruptive spectator from a criminal trial should never be undertaken without a full evaluation of the necessity for the exclusion . . . . This evaluation should be reflected in the record of the proceedings." (*People v. Esquibel* (2008) 166 Cal.App.4th 539, 556.)

Here, in view of the lack of substantial evidence establishing a connection between the appellant's family and the purported witness fear and intimidation, and the court's failure to evaluate the claim of witness fear and intimidation more thoroughly, the first requirement of *Waller* was not met.

Accordingly, under these circumstances, the exclusion of appellant's family from the courtroom during the testimony of three

10

of the victims violated appellant's constitutional right to a public trial.[4] And where, as here, a defendant has been deprived of his constitutional right to a public trial, no showing of prejudice is required "[b]ecause the right to a public trial protects the defendant from very subtle but very real injustices," and "[r]equiring such a defendant to prove actual prejudice would deprive most defendants of the right to a public trial." (*Davis v. Reynolds* (10th Cir. 1989) 890 F.2d 1105, 1111; accord, *Waller, supra*, 467 U.S. at pp. 49–50; *People v. Bui* (2010) 183 Cal.App.4th 675, 680.)

The more difficult question is the appropriate remedy in this case. Although a defendant need not show prejudice resulting from the violation of the public trial right, the remedy, the Supreme Court has stated, "should be appropriate to the violation." (*Waller, supra*, 467 U.S. at p. 50; see also *United States v. Rivera* (9th Cir. 2012) 682 F.3d 1223, 1236-1237.) Reversal and a new trial is an inappropriate remedy when it "presumably would be a windfall for the defendant, and not in the public interest." (*Waller, supra*, 467 U.S. at p. 50; see *Brown v. Kuhlmann* (2d Cir. 1998) 142 F.3d 529, 539 [reversal of conviction may constitute "disproportionate relief" in some cases for violation of public trial right].)

The requirement that the remedy be appropriate to the violation implies that all violations of the public trial right are not equal, and that the nature and extent of the violation should inform and shape the remedy. In considering whether a public trial right violation has occurred, courts have treated partial closures—i.e.,

---

[4] Although the trial court's initial order excluded appellant's family during the testimony of L.T. and E.J. only, the court did not lift the order until after L.T.'s aunt, victim J.V., and J.V.'s father testified.

when only some persons are excluded from the courtroom—differently from total closures. (See, e.g., *People v. Woodward*, *supra*, 4 Cal.4th at p. 384; *People v. Esquibel*, *supra*, 166 Cal.App.4th at pp. 552-554; *U.S. v. Osborne* (5th Cir. 1995) 68 F.3d 94, 98-99.) Such different treatment is appropriate because "the values that the Constitution's public trial guarantee seeks to protect, which include permitting the public to see that a defendant is dealt with fairly, ensuring that trial participants perform their duties conscientiously, and discouraging perjury . . . are only moderately burdened when the courtroom is partially closed to the public, as certain spectators remain and are able to subject the proceedings to some degree of public scrutiny." (*Judd v. Haley* (11th Cir. 2001) 250 F.3d 1308, 1315-1316; see also *Woods v. Kuhlmann* (2d Cir. 1992) 977 F.2d 74, 76 [partial closures and total closures are not equal violations "because a partial closure does not implicate the same secrecy and fairness concerns that a total closure does"].) These considerations should guide not only the determination of whether a defendant's public trial right has been violated, but also the remedy for the violation. As one court stated, "[i]f the remedy of a new trial without a showing of prejudice is intended to deter unjustified courtroom closures, then the necessity for that remedy should depend on the degree to which it 'could be charged that the judge deliberately enforced secrecy in order to be free of the safeguards of the public's scrutiny.' " (*Brown v. Kuhlmann, supra*, 142 F.3d at p. 541.) And just as the existence of a violation "must be determined by reference to the facts of the particular case" (*People v. Esquibel, supra*, 166 Cal.App.4th at p. 553), so must the propriety of the remedy.

Here, although the temporary exclusion of appellant's family members violated his right to a public trial, and he is entitled to a

12

remedy for that violation, the values protected by the public trial guarantee were only moderately at risk.  The general public was never excluded from any part of the trial, and such openness generally ensured that the trial participants would perform their duties properly—the court did not " 'deliberately enforce[] secrecy in order to be free of the safeguards of the public's scrutiny.' " (*Brown v. Kuhlmann, supra*, 142 F.3d at p. 541.)  To be sure, it is conceivable that the absence of appellant's family members may have affected the testimony of the witnesses who testified during that time and, consequently, impacted the values protected by the public trial right as to the counts related to such testimony. Because appellant is not required to show prejudice to be entitled to a remedy, we do not attempt to measure that possible impact. Accordingly, the convictions on those counts must be reversed.

The absence of the family members during the testimony concerning the crimes against E.J., L.T., and J.V., however, had no material effect on the counts concerning the crimes against A.S., J.G., and K.M.  Reversing the convictions on these counts would constitute "a windfall for the defendant" and be contrary to "the public interest."  (See *Waller, supra*, 467 U.S. at p. 50.) We therefore decline to order such a remedy.

In light of the nature of the violation—a partial and temporary closure—and the particular facts and circumstances in this case, the appropriate remedy is to reverse the convictions on counts 3, 5, and 6, and affirm the convictions on counts 1, 2, and 4.

**DISPOSITION**

The judgment is reversed as to counts 3, 5, and 6 and is otherwise affirmed.

**CERTIFIED FOR PUBLICATION**.


ROTHSCHILD, P. J.

We concur:


CHANEY, J.


JOHNSON, J.

14