Filed 12/28/22  P. v. Waldron CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>NEIL BRUCE WALDRON,<br><br>        Defendant and Appellant. | A161210<br><br>(Mendocino County<br>Super. Ct. No.<br>SCUK-CRCR-20-34917-001) |

In September 2020, appellant Neil Bruce Waldron was convicted by a jury of two felony counts of burglary, along with attendant enhancements for looting.  He was placed on three years' probation and ordered to pay victim restitution and various fees.  In Waldron's wide-ranging appeal, he raises challenges to numerous events that occurred throughout his jury trial: denying him a public trial due to COVID-19 courtroom protocols, contending his looting convictions are unsupported by the evidence (some of which he maintains was erroneously admitted), arguing the prosecutor committed misconduct, and claiming the trial court erred in instructing the jury.  He also argues that recent legislation entitles him to a reduction in his probation term and elimination of certain fees.  We conclude that his probation term must be reduced from three to two years.  We also conclude that the judgment must be modified to strike the balance of unpaid administrative

1

fees that are no longer authorized under recent legislation. We otherwise affirm.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 3, 2020, the district attorney filed an information charging Waldron with two counts of second-degree burglary (Pen. Code, §§ 459, 460, subd. (b); counts one & two);[1] and further alleging that these two offenses constituted looting because they were committed during a state of emergency (Pen. Code, § 463, subd. (a)).

On September 14, 2020, Waldron's jury trial began.

### A.     The Prosecution's Case

On April 17, 2020, at around 3:00 a.m., Mendocino County Deputy Sheriff Trent James was dispatched to the town of Covelo[2] on a report of a potential burglary in progress at a cafe called the Village Hearth. At the time, the ambient conditions were dark and very foggy. When Deputy James was about 50 feet from the Village Hearth, he saw Waldron walking north on the sidewalk. He did not see anyone else within 200 feet of Waldron. He spoke to Waldron briefly and then detained him while he went to the Village Hearth to investigate.

Deputy James observed the open front door of the Village Hearth, as well as the completely shattered glass from the door. There was glass on the ground directly outside the front door, as well as inside the business. Inside the cafe, he saw "stuff thrown all over the place" with everything in disarray. A black pellet rifle was lying on the ground inside the front door. Deputy

---

[1] All undesignated statutory references are to the Penal Code.

[2] Covelo is a small community of about 1,200 people, with one grocery store and two gas stations.

2

James then proceeded across the street to talk to the witness who had reported the incident, after which the deputy returned to speak with Waldron.

Waldron told Deputy James that while he was seated on a bench outside of the local grocery store called Keith's Market, which is about 50 yards north of the Village Hearth, he had "heard a loud banging coming from the front of Keith's Market." He saw a White male with long blond hair wearing a red baseball cap "ramming a shopping cart into the breezeway glass doors" of the store. He also told Deputy James that he had seen that same person pushing the shopping cart across the market parking lot to the back side of the Village Hearth. Deputy James testified that from where Waldron said he had been seated on the bench he would not have had a clear view of Keith's Market because there was "absolutely zero direct line of sight from any of the benches on the side of the store to the breezeway" or to the area that Waldron had described.

Deputy James released Waldron and went to Keith's Market. He saw that the glass from one of the entrance doors to the market was shattered with glass inside the breezeway of the store and outside on the ground. Cartons of cigarettes appeared to have been dropped in the breezeway. When the deputy put his hand through the broken door to unlock and open it, an extremely loud alarm sounded. Inside the market, he saw broken alcohol bottles.

Shortly after contacting the market's manager, Deputy James was able to obtain and view surveillance footage which showed that the person who had broken the door was "holding a rifle of sort." After viewing the video, Deputy James determined that the perpetrator was Waldron, arriving at that conclusion based on his familiarity with Waldron's stature, his build, how he

3

moves, and the clothing the perpetrator was wearing, which was similar to what Waldron was wearing when the deputy encountered him. Also, he noticed Waldron's unique beard, which was white and very bushy. According to Deputy James, there was nobody else in Covelo who looked like Waldron, "especially with that beard."

Waldron was subsequently located about half a mile away from Keith's Market and was arrested. At the time, he was "wearing a black baseball hat, black or dark gray Raider's hoodie [with] a red T-shirt underneath, [and] blue jeans." When Deputy James arrested Waldron, he asked the deputy how he could have broken into Keith's Market since "the alarm didn't even go off."

The manager of Keith's Market testified that the stolen items included "some bottles of liquor and some cartons of cigarettes." He also explained that while the market had an alarm system, it was set with certain contact points so that it would only go off if someone opened the door. Breaking the door's glass would not have triggered the alarm. The owner of the Village Hearth testified that the glass window on the front door of her business had been smashed, and she found broken glass and some electronics strewn about inside.

To support the looting allegations, the prosecution entered two exhibits as evidence: (1) a certified copy of Executive Order N-05-19, issued by Governor Gavin Newsom on January 8, 2019, which addressed California wildfires, and (2) a certified copy of Proclamation 20-004, dated March 4, 2020, in which the governor declared a state of emergency due to the COVID-19 pandemic.

## B. Defense Case

Filmmaker John Slattery testified that he reviewed the surveillance video from Keith's Market and the photographs of Waldron that were

4

admitted into evidence. Slattery edited the low-quality surveillance video to obtain a clearer image of the detail in the video. In the edited video, Slattery could see that the perpetrator was wearing a hat and a sweater, neither of which showed any insignias or logos. Given the detail seen in other objects in the video, Slattery opined that an insignia on the sweater should have been visible. He conceded, however, that the insignia would not have been visible if the perpetrator was wearing an outer jacket over the sweater.

## C. Verdict and Sentencing

On September 17, 2020, the jury found Waldron guilty of both burglary counts and found true the two related allegations of looting. On October 16, 2020, the trial court suspended imposition of sentence and placed Waldron on probation for three years. Various fines and fees were also imposed.

## II.

## DISCUSSION

## A.    Appellant Was Not Denied His Right To A Public Trial

Waldron argues that his Sixth Amendment right to a public trial was violated because the courtroom in which his trial took place had limited public access due to the implementation of COVID-19 social distancing protocols. We are not persuaded.

### 1. Additional Background

Prior to trial, Waldron's trial counsel filed a motion in limine "To Conduct Fully Public Trial." Counsel observed that "[t]he Court will conduct [Waldron's] trial at a time when the world is suffering from the COVID-19 pandemic. Medical guidance from all levels of government suggests the use of face coverings while indoors, and the maintenance of a minimum of six feet of separation between persons indoors ('social distancing') in order to mitigate the virus's spread. The Court has adapted these guidelines to require that

5

jurors have two seats between them." Counsel further reported that "[i]n a prior trial conducted in Department H attended by the undersigned counsel as a member of the public, counsel was the only member of the public who could be seated in the courtroom because all other seats were occupied by jurors or left vacant to allow for social distancing. The Court televised portions of the courtroom on YouTube and to other rooms in the courthouse via closed circuit television. Although viewers could see the counsel conducting witness examination, the witnesses, and the judge, viewers were unable to view the court staff, the jurors, the defendant sitting at counsel table, counsel at counsel table, the investigating officer sitting with the prosecution, or the trial exhibits." Waldron requested "that the Court make all aspects of the trial public—that is, that the public either be admitted to the courtroom in sufficient numbers to make the trial truly public, or that the Court televise camera shots of the jury, court staff, counsel, the defendant, and exhibits in order that members of the public can see the full trial's conduct."

In denying Waldron's motion in limine, the trial court stated: "Okay. We bent over backwards to display our trials on YouTube, we live stream them. Although, it's only the questioning attorney and the witness testifying. Given the fact we're in a global pandemic with 905,000 deaths world wide [*sic*]. 191,000 deaths in the U.S. Nearly 14,000 deaths in California and 18 deaths in Mendocino County. The inability for people watching the live stream to see court personnel or the Judge at different times or the jury at different time[s], the Court finds the need to protect the health and safety of the courtroom personnel and jurors in this matter outweighs the need for the public to see those additional people. [¶] Additionally, there is a Request to Observe form and anyone wishing to observe the trial, No. 1 they can watch it

6

on YouTube.  [¶]  No. 2, if they don't have access to the internet, they can go to the remote viewing room and watch it there.  [¶]  3, they can go to room 303, admin, fill out the request.  It will be given to myself [*sic*] and we'll make every accommodation possible.  I would note once we have a jury picked, I would think we would only have to natures at the most.[3]  Seat No. 15 is open.  And the Court will consider any request to observe as well."

Subsequently, in denying Waldron's motion for new trial, the trial court acknowledged that the court's livestreaming on YouTube remained "a work in progress."  The court also clarified that "[a]dditionally, anytime anyone can submit a request to come in and watch the hearing if there is an open seat available and there was, we had 12 jurors and two alternates leaving one available seat available.  [¶]  Any member of the public could come in and take that seat.  If it wasn't available they would have been directed to Room 303 to request that the court allow them to have a seat to watch the jury trial.  No one submitted such a request during [Waldron's] trial, anonymous or otherwise."

### 2. Applicable Legal Principles

A criminal defendant has a right to a public trial that is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by article 1, section 15 of the California Constitution.  (*Waller v. Georgia* (1984) 467 U.S. 39, 46 (*Waller*); *People v. Woodward* (1992) 4 Cal.4th 376, 382 (*Woodward*).)  "Every person charged with a criminal offense has a constitutional right to a public trial, that is, a trial which is open to the general public at all times.  [Citations.]"  (*Woodward, supra,* 4 Cal.4th 376 at p. 382.)

---

[3] Given the court's subsequent comment, presumably the reference to "natures" is an error, and that the court meant "seats."

7

"The right to a public trial serves two important interests. It protects those who are accused of a crime by helping to ensure that the innocent are not unjustly convicted and that the guilty are given a fair trial. [Citation.] Second, there is a 'strong societal interest in public trials'; they provide an opportunity for spectators to observe the judicial system, improve the quality of testimony, encourage witnesses to come forward with relevant testimony, and prompt judges, lawyers, witnesses, and jurors to perform their duties conscientiously. [Citation.]" (*People v. Scott* (2017) 10 Cal.App.5th 524, 530 (*Scott*).)

Even so, the right to a public trial "is not absolute" and must be "balanced against other interests essential to the administration of justice." (*United States v. Osborne* (5th Cir. 1995) 68 F.3d 94, 98, citing *Waller, supra,* 467 U.S. at p. 45). Such interests include "the size of the courtroom, the conveniences of the court, the right to exclude objectionable characters and youth of tender years, and to do other things which may facilitate the proper conduct of the trial." (*Woodward, supra,* 4 Cal.4th 376, at p. 388 (conc. opn. of Mosk, J.), citing *People v. Hartman* (1894) 103 Cal. 242, 245.)

We consider de novo a defendant's claim that he was denied his constitutional right to a public trial, but review the trial court's underlying factual determinations for substantial evidence. (*Scott, supra,* 10 Cal.App.5th 524, 531.) Where a defendant has been deprived of this right, "no showing of prejudice is required '[b]ecause the right to a public trial protects the defendant from very subtle but very real injustices,' and '[re]quiring such a defendant to prove actual prejudice would deprive most defendants of the right to a public trial.' " (*Id.* at p. 532.)

### 3. Analysis

The trial here took place under difficult circumstances—a time when COVID-19, a once-in-a-century global pandemic, continued to spread through the community, and when the federal government continued to recommend social distancing and masks in indoor public settings to stem the spread of the disease. This was a time too when COVID-19 vaccines were not yet available. (See *Stepien v. Murphy* (D.N.J. 2021) 574 F.Supp. 3d 229, 234 [noting that "vaccines became widely available in the Spring of 2021"].)

The trial court's comments during the hearing on Waldron's motion in limine clearly expressed that it was implementing precautionary measures to protect the community from COVID-19 exposure and spread. As the United States Supreme Court has acknowledged, "[s]temming the spread of COVID-19 is unquestionably a compelling interest." (*Roman Catholic Diocese of Brooklyn, New York v. Cuomo* (2020) 141 S.Ct. 63, 67, 208 L.Ed.2d 206.) Given the impact of the COVID-19 pandemic on Northern California at the time the court was attempting to schedule Waldron's trial, we agree that the goal of limiting the transmission of COVID-19 while holding a trial was an overriding interest. The parties here do not dispute this. Rather, Waldron complains that "the altered [courtroom] layout and inadequate live stream of the trial violated [his] constitutional right to a public trial."

We first observe that although public access to the courtroom was limited to one spectator due to COVID-19 restrictions, the courtroom was not closed to the public. Access to attend the trial in person was available, albeit limited to a single individual at a time. Significantly, there is nothing in the record to suggest that any individuals were turned away or prevented from attending Waldron's trial. To the contrary, in denying Waldron's motion for a new trial, the trial court indicated that no member of the public sought to

9

view the trial in person at any point, including during voir dire and the taking of the verdict, when the public viewing seat was not available.[4] Accordingly, Waldron has arguably failed to establish that his right to a public trial was implicated. We nevertheless address Waldron's contentions.

The Attorney General contends that the limitations on public access imposed here resulted, at best, in only a partial closure of the courtroom. "The test for determining whether a particular closure order violates a defendant's public trial right changes depending on whether the courtroom closure is total or partial." (*United States v. Allen* (9th Cir. 2022) 34 F.4th 789, 797 (*Allen*).) Here, the parties dispute whether the closure was total or partial. For our purposes, the dispute is not dispositive because Waldron concedes that the trial court had an overriding interest in restricting public access to the courtroom in order to comply with social distancing requirements. But even if a closure is partial, it still "must be 'narrowly tailored to serve' the overriding or substantial interest at issue, and the court must consider reasonable alternatives to closing the courtroom. [Citation.] Courts must sua sponte consider possible alternatives to a closure 'even when

_____

[4] During voir dire, this seat was reportedly occupied by a prospective juror. During the taking of the verdict, the seat was occupied by a member of the prosecutor's staff. Arguably, this de minimus exclusion was justified by the public health emergency and by a desire to protect the parties, court personnel, and the jury from COVID-19. (See *Woodward, supra,* 4 Cal.4th 376 at pp. 383-386 [public trial guarantee may be rebutted by a showing that excluding the public is necessary to protect a " 'higher value' " such as maintaining security]; *People v. Bui* (2010) 183 Cal.App.4th 675, 686-689 [temporary exclusion of the defendant's family members from courtroom during jury selection did not require reversal; see also *People v. Virgil* (2011) 51 Cal.4th 1210, 1237-1238 [brief, justifiable exclusion of the public imposes no more than a de minimus restriction on the right to a public trial].)

they are not offered by the parties.' [Citation.]" (*Allen, supra,* 34 F.4th 789 at p. 797.)

Waldron maintains that the configuration of the courtroom was problematic because "important portions of the trial were not visible on the live stream." He asserts that the closure was overly broad because the only trial participants who were fully visible on the livestream were the witnesses. He notes that jurors and court staff were never visible, and the investigating officer, counsel, and Waldron were only sometimes visible during the trial. Also, the judge was visible only from a viewpoint that placed her behind the testifying witnesses. Waldron also complains that the trial court did not consider reasonable alternatives to restricting access to the proceedings. We disagree.

Waldron claims the trial court merely ruled that the YouTube livestream was sufficient to satisfy constitutional requirements, implying that the court intentionally deprived him of superior alternatives, such as adding additional cameras. The allegations are not convincing. As noted above, the court did not close the trial, but rather instituted procedures for members of the public to view the proceedings, either in person, at the courthouse, or remotely. The judge indicated that the court's capacity to livestream was evolving, and never suggested that it was using anything less than the best available technology. While Waldron argues that the court should have incorporated additional cameras to ensure that all the participants were visible, he offers no evidence that the court had the resources to accomplish this feat. Nor does he describe any other reasonable alternatives that the court could have used to provide greater access to the proceedings.

11

While we agree with Waldron that trial courts are required to ensure a defendant's right to a public trial, we do not agree that courts are required to accomplish that which is nearly impossible. In the absence of any evidence suggesting that the trial court here could have provided superior livestreaming along the lines that Waldron suggests, we have no basis upon which to hold that the court failed to protect Waldron's public trial rights to the greatest extent possible at the time.

In sum, since we find that the trial court properly limited public access to the courtroom due to COVID-19, and provided adequate alternative public access to the trial via livestreaming, Waldron's constitutional right to a public trial was not violated. We emphasize, however, that our holding is a narrow one based on the particular facts of this case. Occasions may well exist, due to the varying nature of the pandemic, evolving health and safety measures, and the availability of livestreaming technological advances, when the balance tips differently. That is not the case on the record before us.

## B.  Sufficiency of the Evidence of Looting

Waldron contends that the evidence was insufficient to support his conviction for looting because "the looting statute must be limited to acts of theft and burglary that occur during the type of disasters that leave property vulnerable to theft and strain law enforcement resources." He further argues that neither the order addressing wildfire susceptibility, nor the state of emergency declaration for the COVID-19 pandemic fall within the term "natural or manmade disaster" under section 463. Finally, he claims that section 463 is unconstitutionally vague.

### 1.  Additional Background

To support the looting charges, the prosecutor relied on two documents, (1) a certified copy of a January 8, 2019 executive order issued by Governor

Gavin Newsom detailing the destruction endured by the state in 2018 due to wildfires, and ordering funding and studies to combat this destruction, and (2) a statewide declaration of a state of emergency issued by the governor on March 5, 2020 due to the COVID-19 pandemic.

## 2. Penal Code Section 463

Section 463, subdivision (a) provides, in relevant part: "Every person who violates Section 459, punishable as a second-degree burglary pursuant to subdivision (b) of Section 461, during and within an affected county in a 'state of emergency' or a 'local emergency,' or under an 'evacuation order,' resulting from an earthquake, fire, flood, riot, or other natural or manmade disaster shall be guilty of the crime of looting . . . ."

Section 463 goes on to define the term "state of emergency" to mean "conditions that, by reason of their magnitude, are, or are likely to be, beyond the control of the services, personnel, equipment, and facilities of any single county, city and county, or city and require the combined forces of a mutual aid region or regions to combat." (§ 463, subd. (d)(1).)[5] The statute further provides that "[f]or purposes of this section, a 'state of emergency' shall exist from the time of the proclamation of the condition of the emergency until terminated pursuant to Section 8629 of the Government Code. . . ." (*Id.* at subd. (d)(3).) We note that there are no published cases construing section 463. Still, we agree with Waldron that this provision "functions as an

---

[5] "Local emergency" is defined to mean "conditions that, by reason of their magnitude, are, or are likely to be, beyond the control of the services, personnel, equipment, and facilities of any single county, city and county, or city and require the combined forces of a mutual aid region or regions to combat." (§ 463, subd. (d)(2).)

enhancement applicable to second-degree burglary and certain theft crimes if committed under certain disaster conditions."[6]

### 3. Penal Code Section 463 Is Not Void For Vagueness

We first address Waldron's claim that section 463 is unconstitutionally vague unless the statute is interpreted to require a nexus between the state of emergency and the criminal act.

"Due process requires fair notice of what conduct is prohibited. A statute must be definite enough to provide a standard of conduct for its citizens and guidance for the police to avoid arbitrary and discriminatory enforcement. [Citations.] 'Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed.' [Citation.]" (*People v. Townsend* (1998) 62 Cal.App.4th 1390, 1400–1401 (*Townsend*); see also *People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1115 (*Acuna*); *People v. Ervin* (1997) 53 Cal.App.4th 1323, 1328 (*Ervin*).) The void-for-vagueness doctrine "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. [Citations.]" (*Kolender v. Lawson* (1983) 461 U.S. 352, 357.) A criminal statute is unconstitutionally vague on its face only if it is " 'impermissibly vague *in all of its applications*.' " (*Acuna* at p. 1116.)

---

[6] Under section 463, if the defendant is granted probation, the statute sets a presumptive minimum punishment of 180 days imprisonment in the county jail unless the sentencing court specifically finds the interest of justice would best be served by reducing or eliminating the mandatory jail sentence. (§ 463, subd. (a).) A felony violation where probation is not granted is punishable according to the same sentencing scheme as regular second-degree felony burglary. (§§ 461, subd. (b), 463, subd. (a).)

The starting point of our analysis is the presumption that legislative enactments must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. (*Ervin, supra,* 53 Cal.App.4th at p. 1328; *People v. Fannin* (2001) 91 Cal.App.4th 1399, 1403 [the constitutionality of a statute designed to protect the public from dangerous weapons must be sustained if possible].) A statute will not be held void for vagueness if any reasonable and practical construction can be given its language, or if its terms may be made reasonably certain by reference to other definable sources. Reasonable specificity is all that is required. (*Acuna, supra,* at p. 1117; *Townsend, supra,* at p. 1401.) The fact that a statute contains "one or more ambiguities requiring interpretation does not make the statute unconstitutionally vague on its face [citation] . . . ." (*In re Jorge M.* (2000) 23 Cal.4th 866, 886; *People v. Hazelton* (1996) 14 Cal.4th 101, 109.)

Waldron asserts that this statute is unconstitutionally vague because it is "impossible for an ordinary person to know whether an emergency declaration exists for a particular area or county at any given time," at least where the emergency conditions are not obvious such as an earthquake or fire. He also asserts "there is no easy way to track the existence of emergency declarations, and they are not promptly terminated when disaster conditions cease."

Applying the above principles to section 463 under the circumstances of the instant case, we conclude the statute is not unconstitutionally vague. The legislative purpose of the statute, which is to provide further deterrence acts of theft during disaster situations, should be readily apparent to an ordinary person. And while it may not always be patently obvious that an active state of emergency exists, it is not unreasonable to expect citizens to be

15

aware of public emergency declarations.  Here, the general public was well aware of exigent situation created by the COVID-19 pandemic by April 2020, and the Governor's decision to declare a state of emergency was well-publicized.

Waldron alternatively contends that we should interpret section 463 to require a nexus between the theft and the existing disaster condition.  He notes that some jurisdictions with similar looting statutes require such a nexus.  For example, the Florida looting statute requires that the "perpetration of the burglary is facilitated by 'conditions arising from the emergency.' " (See *Williams v. State* (2020) 305 So.3d 673, 676, fn. 2.)  Since we conclude the statute is not unconstitutionally vague as written, we decline Waldron's invitation to engage in this interpretive exercise.

At oral argument, Waldron's counsel also highlighted the contention that because the Governor's COVID-19 emergency order is still in effect today, a prosecutor could currently charge *any* second degree burglary as looting.  Courts, however, are not required to " 'consider every conceivable situation which might arise under the language of the statute and will not consider the question of constitutionality with reference to hypothetical situations.' " (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1095.)  We need not decide whether a looting charge necessarily could be sustained in connection with every burglary that occurs during a prolonged emergency period, since here the crime unquestionably occurred in April 2020 during the height of the COVID-19 pandemic emergency.

### 4. Sufficiency of the Evidence

"We review the sufficiency of the evidence to support [an] enhancement according to accepted rules of appellate review: we view the record in the light most favorable to the prosecution and may not reverse the judgment if

any rational trier of fact could have found the essential elements of the enhancement beyond a reasonable doubt. [Citation.]" (*People v. Frausto* (2009) 180 Cal.App.4th 890, 897.) Where our consideration of the sufficiency of the evidence also requires us to construe the applicable statute, "we apply a de novo standard of review and the usual rules of statutory interpretation. [Citation.]." (*Ibid*.)

Waldron asks us to limit the application of section 463 by confining it to disasters that are "Sudden and Calamitous" and that place strains on law enforcement resources. We decline to do so, as we discern no ambiguity in the statute's language. Section 463 expressly applies to declared states of emergency that are based on "conditions that, by reason of their magnitude, are, or are likely to be, beyond the control of the services, personnel, equipment, and facilities of any single county, city and county, or city and require the combined forces of a mutual aid region or regions to combat." (§ 463, subd. (d)(1).) Waldron's reading of this provision is unduly narrow and is not supported by the statute's plain language. We also observe that it is common knowledge that the COVID-19 pandemic has produced wide-ranging negative consequences that have strained many different aspects of public services, not just law enforcement. We have no doubt that property crimes such as those which occurred here, serve to exacerbate these strains, consequently increasing the negative impact of COVID-19 on the community as a whole.

Waldron also contends that the COVID-19 pandemic "is not a disaster condition that triggers application of section 463." We disagree. While the California courts have not yet expressly spoken on the issue of whether the COVID-19 pandemic is a natural or manmade disaster, other state courts and federal courts have held that it does constitute a natural disaster. (See

17

e.g., *Pennsylvania Democratic Party v. Boockvar* (Pa. 2020) 238 A.3d 345, 370 ["We have no hesitation in concluding that the ongoing COVID-19 pandemic equates to a natural disaster"]; see also *JN Contemporary Art LLC v. Phillips Auctioneers, LLC* (S.D. N.Y. 2020) 507 F.Supp.3d 490, 501 ["It cannot be seriously disputed that the COVID-19 pandemic is a natural disaster"].) We join these courts in concluding that the COVID-19 pandemic qualifies as a "natural disaster," here, for purposes of supporting the looting allegation under section 463.[7]

No one can reasonably dispute that Mendocino County was affected by the COVID-19 pandemic at the time of the offenses. Waldron does not contend otherwise. But he faults the prosecution for failing to present any direct evidence that the county was affected by the COVID-19 crisis, apart from the emergency proclamation.

We conclude the Governor's proclamation, however, supplied substantial evidence that the COVID-19 emergency existed statewide at the time of the offenses, which would necessarily include Mendocino County. Indeed, the jurors' common knowledge as members of the community, including their experience as jurors subject to COVID-19 restrictions during the entirety of the trial, was enough to support the existence of the emergency situation in their local county when Waldron committed the offenses.

We do agree with Waldron that the Governor's wildfire order, standing alone, does not support the existence of state of emergency under section 463.

---

[7] We note that Government Code section 8625 provides that the Governor may declare a state of emergency based on the existence of "conditions of disaster or of extreme peril to the safety of persons and property," including where such conditions are caused by an "epidemic." (Gov. Code, § 8558.)

As noted above, the prosecutor relied, in part, on a certified copy of an executive order dated January 8, 2019, detailing the destruction endured by the state in 2018 due to wildfires, and ordering funding and studies to combat future wildfires (Executive Order N-05-19). The order itself is not a declaration of a state of emergency, nor did it reference any then-existing emergency situation. Rather, the order directed Cal Fire and related state agencies to study the problem of wildfires brought about by drought, poor forest management policies, and "the reality of climate change," and to produce a report recommending administrative and policy measures to "prevent and mitigate wildfires." Thus, the order itself does not support the existence of a then-current state of emergency. Further, nothing in the record to suggest that there were any active destructive wildfires in Mendocino County, or any other part of the state, when the offenses were committed in April 2020.[8] Under these circumstances, we agree with Waldron that the January 8, 2019 executive order was insufficient to support a looting allegation under section 463. Due to the COVID-19 emergency declaration providing substantial evidence in support of the jury's verdict, the convictions must stand.

## C.    Jury Instruction on Looting

Waldron next asserts that his convictions for looting must be reversed because the jury was not properly instructed on the elements of the offense.

Because no pattern instructions have been developed for looting, the trial court drafted the following special instruction for the looting enhancement:

---

[8] The Attorney General notes that Mendocino County experienced several wildfires in 2020. However, he does not indicate that any of these fires were burning on April 17, 2020, when the offenses were committed.

To prove this special finding, the People must prove that the defendant committed a burglary in the second degree AND it was committed during and within an affected county in a "state of emergency" resulting from an earthquake, fire, flood, riot or other natural or manmade disaster.

"[S]tate of emergency," means conditions that, by reason of their magnitude are, or are likely to be, beyond the control of the services, personnel, equipment, and facilities of any single county, city and county, or city and require the combined forces of a mutual aid region or regions to combat.

Waldron complains that the instruction did not explain the terms "affected" or "natural or manmade disaster," or give any guidance to the jury as to how to determine whether these elements were met. In his second supplemental brief, he further contends that the looting instruction was incomplete because the jury was not instructed that it had to find that an emergency had been declared in accordance with the California Emergency Services Act (Gov. Code, § 8550 et. seq.) and other applicable sections of the Government Code.

"A trial court has a sua sponte duty to 'instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case . . . ' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 845-846, quoting *People v. Carter* (2003) 30 Cal.4th 1166, 1219.) " 'The trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 332, quoting *People v. Merritt* (2017) 2 Cal.5th 819, 824.)

With respect to Waldron's claim that the trial court failed to define the terms "affected" and "natural or manmade disaster," it is established that "[a]

20

court has no sua sponte duty to define terms that are commonly understood by those familiar with the English language, but it does have a duty to define terms that have a technical meaning peculiar to the law." (*People v. Bland* (2002) 28 Cal.4th 313, 334 (*Bland*); accord *People v. Krebs* (2019) 8 Cal.5th 265, 331 ["[a] court's duty to define statutory terms 'arises where the terms have a technical meaning that is peculiar to the law' "].) "A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning. [Citation.] Thus, … terms are held to require clarification by the trial court when their statutory definition differs from the meaning that might be ascribed to the same terms in common parlance." (*People v. Estrada* (1995) 11 Cal.4th 568, 574-575.)

Waldron does not argue that the terms "affected" or "natural or manmade disaster" have "a technical meaning peculiar to the law." (*Bland, supra,* 28 Cal.4th 313 at p. 334.) Nor did he request clarification of these terms during the trial. The challenged terms were not used in a way that differs from their non-legal meaning. Under these circumstances, if Waldron wanted the terms defined, it was his obligation to request an instruction. (*Estrada, supra,* 11 Cal.4th 568, at p. 574; accord, *People v. Lucas* (2014) 60 Cal.4th 153, 296, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.) Because he did not, his contention is forfeited. "A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal." (*People v. Lee* (2011) 51 Cal.4th 620, 638.)

Similarly, if Waldron desired to augment the instruction by referencing the statutory requirements for declaring a state of emergency, he should have requested changes to the instruction. Given that he did not ask for such changes, this claim also has been forfeited. (See *People v. Hart* (1999) 20 Cal.4th 546, 622 [generally, " '[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language' "].) In any event, Waldron essentially concedes that the omission of the requirement for declaring a state of emergency was not prejudicial as to the COVID-19 emergency order because it "was clearly declared" in accordance with applicable statutes. In sum, we find no error in the trial court's special jury instruction.

## D. Unanimity Instruction

Waldron claims that the trial court erred in failing to give a unanimity instruction. He observes that the record does not indicate which alleged state of emergency (COVID-19 or wildfires) the jury found affected the county on the date of the break-ins, and that the prosecutor argued both states of emergency had rendered the offenses looting. Waldron contends that the court erred in failing to instruct the jury that it had to unanimously agree on which state of emergency supported the looting convictions. We find no error.

### 1. Applicable Legal Principles

A criminal defendant has a constitutional right to a unanimous jury verdict. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*); *Ramos v. Louisiana* (2020) 140 S.Ct. 1390, 1402; 206 L.Ed.2d 583.) Each individual juror must be convinced, beyond a reasonable doubt, that the defendant committed the specific offense he or she was charged with. (*Russo,* at p. 1132; *People v. Hernandez* (2013) 217 Cal.App.4th 559, 569 (*Hernandez*).)

22

The unanimity requirement " 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' " (*Russo,* at p. 1132.) "When a defendant is charged with a criminal offense, but the evidence suggests *more than one discrete crime,* either the People must elect among the crimes or the trial court must instruct the jurors that they all agree on the same criminal act. [Citations.]" (*People v. Sorden* (2021) 65 Cal.App.5th 582, 615.)

Because our consideration of whether the trial court should have given a particular jury instruction involves a mixed question of law and fact which is " 'predominantly legal,' " we review de novo whether the specific instruction was required. (*Hernandez, supra,* 217 Cal.App.4th at p. 568.)

2. **Analysis**

Waldron's contentions arguably do not implicate unanimity principles because he does not contend that the evidence established multiple acts that could constitute the crimes charged. Instead, his arguments focus on the alternate bases for the looting enhancement based on the governor's wildfire and COVID-19 orders. Assuming, without deciding, that unanimity principles apply in this case, we find the error, if any, was harmless even under the *Chapman* harmless-beyond-a-reasonable-doubt standard. (*Hernandez, supra,* 217 Cal.App.4th at pp. 576-577 [noting split of authority as to whether *Chapman* or *Watson* standard applies to erroneous omission of unanimity instruction].)[9]

"[E]rroneous failure to give a unanimity instruction is harmless if disagreement among the jurors concerning the different specific acts proved is not reasonably possible." (*People v. Napoles* (2002) 104 Cal.App.4th 108,

_____

[9] *Chapman v. California* (1967) 386 U.S. 18; *People v. Watson* (1956) 46 Cal.2d 818.

119, fn. omitted.) Where a "defendant offered the same defense to all criminal acts, and 'the jury's verdict implies that it did not believe the only defense offered,' failure to give a unanimity instruction is harmless error." (*Hernandez, supra,* 217 Cal.App.4th at p. 577; *People v. Wolfe* (2003) 114 Cal.App.4th 177, 188 [failure to give unanimity instruction was harmless error where jury clearly rejected unitary defense to all criminal acts].) Such is the case here.

Waldron's sole defense was based on identification, and the jury's verdict makes clear it did not believe his defense that he was not the person who committed the two burglaries. While the Governor's wildfire order, standing alone, would not have supported the looting allegation, as we have already discussed there was substantial evidence that he committed the burglaries during a declared state of emergency relating to the COVID-19 pandemic. It is not reasonably possible that the jurors would have disagreed on that point, regardless of how they might have viewed the January 2019 wildfire order. Accordingly, Waldron has failed to show reversible error.

## E.    Admissibility of The Executive Order and Emergency Declaration

Waldron next contends that the trial court erred when it allowed the jury to consider People's exhibits No. 3 and No. 4, the Governor's wildfire executive order and the emergency declaration, for the truth of their contents. We disagree.

### 1.  Additional Background

The Governor's March 2020 proclamation of the COVID-19 state of emergency contained specific facts (e.g., that there were 53 cases of COVID-19 in California at that time), as well as generalized policy assertions. Examples of these assertions included that "California has a strong federal,

24

state, and local public health and health care delivery system," and that "personal protective equipment (PPE) is not necessary for use by the general population." The Governor's wildfire executive order explained the reasons for the executive action by reference to specific facts (e.g., the number of acres burned by wildfires in 2018), and included statements presumably based on the work of various governmental agencies (e.g., that grazing reduces fire intensity).

Before trial, the trial court ruled that the prosecution could admit certified copies of both documents. Defense counsel imposed a hearsay objection to the underlying facts contained in the documents, but did not object to the admission of the documents to show that the Governor had in fact issued the wildfire order and the emergency declaration. The court concluded that the documents fell within Evidence Code section 1280's official records hearsay exception.

After the jury rendered its verdict, defense counsel filed a motion for a new trial based, in part, on the trial court's admission of the two exhibits. The trial court denied the motion. On appeal, Waldron asserts that the two orders were not admissible under Evidence Code section 1280 because the documents were not created to record the existence of the emergency conditions. He further contends that even if the hearsay exception applies, the court erred in finding the documents satisfied the exception's foundational requirements.

### 2. Applicable Legal Principles

Evidence Code section 1280 provides, "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applies: [¶] (a) The writing was made

25

by and within the scope of duty of a public employee. [¶] (b) The writing was made at or near the time of the act, condition, or event. [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

### 3. Analysis

Waldron asserts that the challenged documents "did not meet the threshold requirement that the official record be created in order to record the act, condition, or event it is offered to prove, and thus the orders were not admissible." He relies on *Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875 (*Lockley*), in which the appellate court held that "[u]nder section 1280 of the Evidence Code, appellate opinions do come within the exception to the hearsay rule for official records [citation]", although "while an official record of an appellate opinion can be admitted to prove the truth of the facts asserted, the most it may prove is that the appellate opinion was delivered and that the court made orders, factual findings, judgments and conclusions of law." (*Id.* at p. 885.) Waldron argues that "[s]imilarly, the COVID-19 emergency declaration was admissible as an official record for the purpose of proving a state of emergency was declared, as the purpose of creating the written declaration was to record the Governor's act of proclaiming an emergency. However, the factual assertions contained in the order were not made admissible simply by their inclusion in the order."

The Attorney General counters that *Lockley* is not controlling here because the issue in that case was whether the trial court properly took judicial notice of hearsay contained in an appellate opinion (see *Lockley, supra,* 91 Cal.App.4th 875 at p. 883), not whether certified documents issued by public employees were admissible for their truth under section 1280. The

Attorney General maintains that "the question here was not whether the facts relied on by the governor and included in his executive order and declaration of a state of emergency, were true, but whether those facts were probative as to the governor's issuance of the order and declaration." He relies on *People v. Woodell* (1998) 17 Cal.4th 448 (*Woodell*). In *Woodell,* the Supreme Court determined that an appellate opinion was admissible "for the nonhearsay purpose of determining the basis of the [defendant's prior] conviction." (*Id*. at p. 459.)

In the present case, the trial court found both of the Governor's official orders admissible as official records that were relevant to establishing the existence of emergency conditions for purposes of the looting statute. The court explained "the Governor in his findings covers what's necessary under" section 463, subdivision (d)(1),[10] and "the jury can do with these findings what they want. They can reject them, they can disagree that we're not under a state of emergency and that circumstances are out of control."

We agree with the Attorney General that the issue here is distinguishable from the issue in *Lockley*. Here, it does not appear that the specific statements contained in the wildfire order or the emergency declaration were offered for their truth. For example, at no point did the prosecutor reference the emergency declaration's statement that as of March 2020 there were 53 cases of COVID-19 in California. Nor did he ask the jury to consider the Governor's policies on personal protective equipment or the

_____

[10] Again, section 463, subdivision (d)(1) provides: "For purposes of this section, 'state of emergency' means conditions that, by reason of their magnitude, are, or are likely to be, beyond the control of the services, personnel, equipment, and facilities of any single county, city and county, or city and require the combined forces of a mutual aid region or regions to combat."

27

status of the state's public health care delivery systems.  Instead, he argued that the looting charges were supported by the official documents that had been admitted into evidence.  Thus, the challenged exhibits were relevant and admissible not to show exactly what the underlying emergency conditions were, but to show the basis for the Governor's decision to issue the emergency declaration.  In sum, the court properly applied the official records exception to the documents at issue.

Waldron also contends that the trial court abused its discretion when it found that Evidence Code section 1280's foundational requirements had been satisfied.  He asserts that the Governor's orders do not provide sufficient evidence of the trustworthiness of the facts or conclusions contained therein.

"Whether the trustworthiness requirement has been met is a matter within the trial court's discretion."  (*People v. Parker* (1992) 8 Cal.App.4th 110, 116.)  Evidence Code section 1280 " 'permits the court to admit an official record or report without necessarily requiring a witness to testify as to its identity and mode of preparation if the court takes judicial notice or if sufficient independent evidence shows that the record or report was prepared in such a manner as to assure its trustworthiness.' [Citation.]  'In addition to taking judicial notice, a court may rely on the rebuttable presumption that official duty has been regularly performed (Evid. Code, § 664) as a basis for finding that the foundational requirements of Evidence Code section 1280 are met.' [Citation.]"  (*People v. George* (1994) 30 Cal.App.4th 262, 274.)

While Waldron suggests the Governor's executive orders were not trustworthy because they did not identify the sources of the information the Governor relied on, given the statutory presumption that his official duty was regularly performed, it can reasonably be inferred that the relevant information had been confirmed, and correspondingly reliable.  (See *Fisk v.*

28

*Department of Motor Vehicles* (1981) 127 Cal.App.3d 72, 78-79 ["... the essential 'circumstantial probability of trustworthiness' justifying the common law exception to the hearsay rule for official statements 'is related in its thought to the presumption that public officers do their duty. When it is a part of the duty of a public officer to make a statement as to a fact coming within his official cognizance, the great probability is that he does his duty and makes a correct statement.' [Citation.]"]; see also *Gananian v. Zolin* (1995) 33 Cal.App.4th 634, 640, fn. 4 [citing *Fisk* for this proposition].)

In sum, the trial court did not abuse its discretion in admitting the challenged orders into evidence.

## F. Prosecutorial Misconduct

Waldron contends the prosecutor committed misconduct by communicating to the jury that Waldron had prior negative contacts with law enforcement.

### 1. Additional Background

Before trial, the trial court ruled that the prosecution could not offer evidence that Waldron had a criminal record, or that he had a propensity to commit crimes. The court also ruled as inadmissible evidence that Deputy James had arrested or investigated Waldron prior to the underlying incident. As relevant to the issue of identification, the court ruled that the deputy could testify that he "has worked in Covelo for 'X' number of years, it's a small community. [Waldron], he's had interactions with [Waldron] but not get into he's arrested" or investigated him.

In opening argument, the prosecutor told the jury: "Deputy James knows the defendant quite well because he had numerous professional and personal contacts with the defendant. These are not just passing five-minute talk. Deputy James had occasions to be engaged with the defendant many

29

times in the past. Deputy James knows the defendant very, very well." Defense counsel did not interpose an objection.

Later, during his direct examination, the prosecutor asked Deputy James if he had "occasions to encounter, develop deeper relationships with the certain individuals more so than others [in Covelo]?" Deputy James said he did, and responded affirmatively when asked, "And for those individuals, is this a -- safer to say you know a lot about them?" Deputy James also testified that he had seen Waldron in the Covelo area more than a hundred times prior to the offenses. When the prosecutor asked, "How many times have you encountered the Defendant professionally or personally?" defense counsel requested a sidebar. Deputy James had not responded to the question and it was not asked again.

During closing arguments, the prosecutor noted Deputy James's familiarity with the local residents, explaining that "there were more times professionally and personally that Deputy James has engaged with the Defendant. For community policing purposes, he has to develop relationships with the locals. And with the Defendant, he has many, many experiences." In arguing that the deputy had correctly identified Waldron in the surveillance video, the prosecutor emphasized that the deputy was "a trained observer who has experience with the Defendant, has seen him more than a hundred times, had a professional contacts with the Defendant, personal contacts with the Defendant over entire law enforcement career." Defense counsel did not object to these statements.

## 2. Applicable Legal Principles

The federal and state standards governing prosecutorial misconduct are well settled. " 'When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to

30

render the subsequent conviction a denial of due process, the federal Constitution is violated. Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.' [Citation.]" (*People v. Masters* (2016) 62 Cal.4th 1019, 1052; *People v. Wright* (2021) 12 Cal.5th 419, 443-444.) When a claim of misconduct is based on the prosecutor's arguments before the jury, we consider whether there is a reasonable likelihood the jury construed or applied the challenged remarks in an objectionable fashion. (*People v. Centeno* (2014) 60 Cal.4th 659, 667.) We consider the statements in context, and view the argument and instructions as a whole. (*Ibid.*) "We review claims of prosecutorial misconduct under an abuse of discretion standard." (*People v. Dworak* (2021) 11 Cal.5th 881, 910; *People v. Peoples* (2016) 62 Cal.4th 718, 792-793.)

### 3. Analysis

With respect to his claims regarding the prosecutor's statements made during opening and closing argument, Waldron concedes that he did not object to the any purported instances of misconduct. A "claim of prosecutorial misconduct is forfeited when there was neither a timely and specific objection nor a request for admonition." (*People v. Powell* (2018) 6 Cal.5th 136, 182; *People v. Silveria and Travis* (2020) 10 Cal.5th 195, 306.) Contrary to Waldrons' assertions, the record does not suggest such an objection would have been futile. During trial, counsel successfully objected when the prosecutor asked Deputy James now many times he had encountered Waldron "professionally or personally." There is nothing in the record to suggest that the trial court was predisposed to denying an objection during

31

closing argument made along those lines. Accordingly, the claim of error is forfeited on appeal.

As to the prosecutor's question to Deputy James regarding his contacts with Waldron, defense counsel successfully objected to the question before the deputy answered it and the question was not asked again. Although the trial court did not strike the prosecutor's question or admonish the jury, the jury was correctly instructed that an attorney's questions are not evidence. We find no error.

We also note that this case turned on identification, and Deputy James' familiarity with Waldron was relevant to assessing his ability to identifying the perpetrator in the surveillance video. Deputy James also explained that because Covelo is a small, isolated community, it was important for him to develop close personal relationships with all community members, including business owners and school employees, in order to "kind of bridge that gap between law enforcement and the community." Although it is possible the jurors could have inferred that Waldron's contacts with the deputy were negative, there was no evidence as to the nature of their interactions and such an inference would have been speculative at best. In sum, Waldron's accusations of prosecutorial misconduct are without merit.

## G.    Probation Term

At the time of Waldron's sentencing, the trial court had the authority to impose a three-year probation term. (Former § 1203.1, subd. (a); §§ 463, subd. (a), 1170, subd. (h).) Waldron argues that his probation term must be shortened to two years under the recent amendment to section 1203.1, subdivision (a), which now limits felony probation terms to two years except for certain offenses not relevant here. (See § 1203.1, subds. (m), (l).)

As amended by Assembly Bill No. 1950 (Stats. 2020, ch. 328, §1, p. 94), section 1203.1, subdivision (a) now provides, in relevant part: "The court, or judge thereof, in the order granting probation, may suspend the imposing or the execution of the sentence and may direct that the suspension may continue for a period of time *not exceeding two years*, and upon those terms and conditions as it shall determine." (Italics added.) This modification to section 1203.1 applies retroactively to cases not yet final on appeal. (*People v. Quinn* (2021) 59 Cal.App.5th 874, 879-885; *People v. Sims* (2021) 59 Cal.App.5th 943, 955-964.)

The Attorney General concedes that amended section 1203.1 applies retroactively here, but asks that we remand the matter to the trial court, rather striking any term in excess of that provided by Assembly Bill No. 1950. We observe that Waldron was placed on probation on October 16, 2020. It appears likely that his two-year term of probation will have already expired when this opinion issues. We will remand the issue to the trial court to correct the minute order governing probation to reflect a two-year term of formal probation. Should Waldron or respondent wish to make further motions regarding the status of probation, either party may file the appropriate motion with the trial court.

## H. Probation Condition No. 45

Waldron argues that a probation condition requiring him to cooperate with unspecified "evidence-based practices as directed" by the probation officer, is unconstitutionally vague, overbroad, and an impermissible delegation of judicial authority. As a condition of probation, the trial court checked a prewritten box for condition No. 45, ordering Waldron to "cooperate fully with evidence-based practices as directed by your Probation Officer, (including but not limited to Geo Reentry Services, workbooks, journals, GPS

33

monitoring) and remain working constructively within that program until completion or agreed upon timeframe." The Attorney General agrees that the condition is vague because it does not sufficiently inform Waldron as to what is required of him while on probation. The Attorney General suggests that we remand the condition so that the trial court can modify it.

It is well established that a " 'probation condition "must be sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated,' if it is to withstand a [constitutional] challenge on the ground of vagueness. …" [Citation.].' " (*People v. Mendez* (2013) 221 Cal.App.4th 1167, 1172.) "Generally, we review the court's imposition of a probation condition for an abuse of discretion. [Citations.] However, we review constitutional challenges to a probation condition de novo. [Citation.]" (*In re Shaun R.* (2010) 188 Cal.App.4th 1129, 1143.)

Preliminarily, in light of the fact that Waldron's probation will likely have expired when this opinion is issued, it is unclear whether this issue is moot. In any event, because we are remanding this matter to the trial court we will address the issue here to avoid the possibility of any further appeal.

We begin by agreeing with the parties that the probation condition needs to be modified because the "included but not limited to" designation of evidence-based practices does not place a limit on the type of programming with which Waldron may be required to cooperate. The sentencing record does not clarify the condition. It appears the trial court was concerned with Waldron's past drug use, as the court imposed drug testing as a probation condition. However, it is unclear what other kinds of evidence-based practices the probation department could mandate in addition to those mentioned in condition No. 45.

34

Because the condition in its present form could be interpreted to require Waldron to participate in other unspecified, evidence-based practices, it does not provide him fair warning of what is required of him. We shall therefore direct the trial court to modify condition No. 45 as follows: "As directed by your probation officer, you shall cooperate fully in Geo Reentry Services, workbooks, journals, GPS monitoring, and remain working constructively within that program until completion or agreed-upon timeframe." As worded, there should be no confusion as to which evidence-based practices Waldron is subject.

## I.    Assembly Bill 1869

Waldron next argues that various administrative fees imposed on him should be stricken given the passage of Assembly Bill No. 1869 (2019-2020 Reg. Sess.) (Assembly Bill 1869), which went into effect July 1, 2021. (Stats. 2020, ch. 92, § 11.)

At sentencing, the trial court orally imposed a probation report fee of $412. In its written order of probation filed on October 21, 2020, the court also imposed a supplemental probation report fee of $237 for a violation of probation, a monthly probation supervision fee of $92, and an installment payment system fee of $75 related to the payment of the probation fees.

As to the $412 probation report fee, the Attorney General concedes that Waldron is entitled to relief. As to the remaining fees that Waldron references in his briefing, the Attorney General states that these fees do not appear in the record. This is incorrect. While the fees were not mentioned during sentencing, they do appear to have been imposed under the written order of probation signed by the trial judge.[11]

---

[11] In his reply brief, Waldron suggests that we should correct the written probation order to strike any fees contained there that were not

Assembly Bill 1869 was enacted to "eliminate the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system and . . . all outstanding debt incurred as a result of the imposition of administrative fees." (Stats. 2020, ch. 92, § 2.) Among other things, Assembly Bill 1869 added section 1465.9, which states that "[o]n and after July 1, 2021, the balance of any court-imposed costs pursuant [section] 1203.1b … as [that] section read on June 30, 2021, shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Stats. 2020, ch. 92, §62, subd. (a).) Former section 1203.1, subdivision (b) pertained to fees related to producing a pre-plea or pre-sentence report and administering probation and mandatory supervision.

Because Assembly Bill 1869 makes the unpaid balance of any probation report or administration fee unenforceable and uncollectible, and it requires that any portion of a judgment imposing such a fee be vacated, we shall order the trial court on remand to modify the judgment to vacate the probation report fee of $412, the supplemental probation report fee of $237, the monthly probation supervision fee of $92, and the installment payment system fee of $75.[12]

---

orally imposed. (See *People v. Bongani El* (2021) 65 Cal.App.5th 963, 967.) By not making the argument in his opening brief, however, Waldron forfeited it. (See *People v. Tully* (2012) 54 Cal.4th 952, 1075 ["arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party"]; *People v. Taylor* (2020) 43 Cal.App.5th 1102, 1114, arguments raised for the first time in a reply brief are forfeited].)

[12] We note that to the extent Waldron paid any portion of those fees prior to July 1, 2021, he is not entitled to reimbursement of those payments, as Assembly Bill 1869 strikes only the "unpaid balance" of those fees. (See *People v. Conley* (2016) 63 Cal.4th 646, 656-658.)

**J.    Assembly Bill No. 177**

In a supplemental brief, Waldron argues that pursuant to the recent amendments to section 1465.9, this court should vacate three fees imposed by the trial court: (1) a drug testing fee of $33 per month that was apparently imposed under section 1203.1ab, (2) a $50 installment account fee imposed under section 1205, and (3) a 15% administrative fee imposed in connection with the victim restitution charge pursuant to section 1203.1. The Attorney General agrees that the fines imposed pursuant to section 1205 and 1203.1 are included in amended section 1465.9, subdivision (b), and that the balances owing on those fees as of January 1, 2022 are unenforceable and should therefore be vacated. Regarding the $33 drug testing fee, the Attorney General states that the matter should be remanded to the trial court for clarification, as Waldron was not convicted of any drug-related crimes and it is thus unclear what authority, if any, supported the imposition of this fee.[13]

In September 2021, the Legislature enacted Assembly Bill No. 177, which amended section 1465.9 by adding subdivision (b). (Stats. 2021, ch.

---

[13] Former section 1203.1ab provided: "*Upon conviction of any offense involving the unlawful possession, use, sale, or other furnishing of any controlled substance,* as defined in Chapter 2 (commencing with Section 11053) of Division 10 of the Health and Safety Code, in addition to any or all of the terms of imprisonment, fine, and other reasonable conditions specified in or permitted by Section 1203.1, unless it makes a finding that this condition would not serve the interests of justice, the court, when recommended by the probation officer, shall require as a condition of probation that the defendant shall not use or be under the influence of any controlled substance and shall submit to drug and substance abuse testing as directed by the probation officer. If the defendant is an adult over 21 years of age and under the jurisdiction of the criminal court, is required to submit to testing, and has the financial ability to pay all or part of the costs associated with that testing, the court shall order the defendant to pay a reasonable fee,

257, § 35.) That provision states: "On and after January 1, 2022 the balance of any court-imposed costs pursuant to Section[s] 1001.15, 1001.16, 1001.90, 1202.4, 1203.1, 1203.1ab, 1203.1c, 1203.1m, 1203.4a, 1203.9, 1205, 1214.5, 2085.5, 2085.6, or 2085.7, as those sections read on December 31, 2021, shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (§ 1465.9, subd. (b), italics added.) Assembly Bill No. 177 also repealed and then re-enacted section 1203.1, effective January 1, 2022, eliminating former subdivision (l), which authorized the court to impose an administrative fee to cover the costs of collecting the restitution award in an amount not to exceed 15 percent of the total amount ordered to be paid. (Stats. 2020, ch. 257, §§ 21, 22.)

Based on its plain language, Assembly Bill No. 177 renders the balance of the administrative fees that remained on or after January 1, 2022 unenforceable and uncollectible. As with the fees covered under Assembly Bill No. 1869, we direct the trial court to vacate any portion of the administrative fees imposed under former sections 1205 and 1203.1 that remain unpaid as of January 1, 2022. (Cf. *People v. Clark* (2021) 67 Cal.App.5th 248, 259; *People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 953.)

As to the drug testing fee, Waldron argues that we should strike the fee as unauthorized. We elect to remand the issue to the trial court for reconsideration.

---

which shall not exceed the actual cost of the testing." (Stats. 2021, ch. 257, § 23, subd. (a), italics added.)

# III.
# DISPOSITION

The judgment is conditionally reversed, and the matter remanded to the superior court to modify the judgment as follows: (1) to reduce Waldron's probation term from three years to two years, and, if his probation has not expired, to modify probation condition No. 45 consistent with this opinion; (2) to reflect that any balances remaining unpaid as of July 1 2021 for the $412 probation report fee, the $237 supplemental probation report fee, the $92 monthly probation supervision fee, and the $75 installment payment system fee are unenforceable and uncollectable, and to vacate the portion of the judgment imposing those costs; (3) to reflect that any balances remaining unpaid as of January 1, 2022 for the $50 installment account fee imposed under section 1205, and the 15% administrative fee imposed in connection with the victim restitution charge pursuant to section 1203 are unenforceable and uncollectable, and to vacate the portion of the judgment imposing those costs; and (4) to clarify the authority (if any) supporting imposition of the drug testing fee and, if there is no such authority to strike the fee, or, if authority exists for the fee, to vacate the portion of the judgment imposing this cost and reflect any balance remaining unpaid as of January 1, 2022 is unenforceable and uncollectable.

Thereafter, the court shall amend its records to reflect modifications to its prior orders and shall forward a copy of the amended orders to all appropriate authorities. As modified, the judgment is affirmed.

DEVINE, J.*

WE CONCUR:


HUMES, P. J.


BANKE, J.


A161210N

---

* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.